## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

---

**DARNISHA GARBADE**,

        Plaintiff,

    v.                         Case No. 21-cv-1283

**TAYLOR M. WISHAU**
**(in his individual capacity),**

        Defendant.

---

## COMPLAINT

---

NOW COMES THE PLAINTIFF, Darnisha Garbade, by her attorneys Gingras, Thomsen & Wachs by Mark L. Thomsen, Paul A. Kinne, and Kimberly D. Sweatt and hereby states the following as her Complaint in the above-referenced matter.

### NATURE OF PROCEEDINGS

1.     This civil action is brought pursuant to 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, to redress the unlawful retaliatory treatment of plaintiff by Defendant Wishau.

### PARTIES

2.     At all times relevant hereto, Darnisha Garbade (Garbade) has been an adult resident of the State of Wisconsin.  She presently resides within the Eastern District of Wisconsin.

3.     Defendant Taylor Wishau (Wishau) is presently the Burlington Area School

1

District School Board Treasurer. All conduct attributable to him described in this complaint was undertaken intentionally, and committed within the scope of his employment and under color of law.

<u>JURISDICTION AND VENUE</u>

4.     This court has jurisdiction over this matter pursuant to 42 U.S.C. § 1983, the First and Fourteenth Amendments to the United States Constitution, and pursuant to 28 U.S.C. §§ 1331 and 1343.

5.     This claim may be venued in the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1391, insofar as all the parties reside and/or do business in this district, and the circumstances giving rise to the claim occurred in this district.

<u>FACTUAL ALLEGATIONS</u>

6.     In fall of 2016 Garbade enrolled her children in the Burlington Area School District (BASD).

7.     Beginning in October, 2017, and continuing thereafter, Garbade emailed and spoke to school district staff and administrators, school board members, and the Burlington community about an issue of crucial public concern, i.e., about racism in the Burlington Area School District. She pointed out that Black students and other students of color were treated unfairly and differently than the white students. She further described that the BASD had failed to reasonably address unlawful racial bullying and that the BASD was allowing a racially hostile environment to fester and grow in violation of Title VI of the Civil Rights Act of 1964.

2

8.     In 2018, Taylor Wishau was elected to serve on the Burlington Area School District School Board.

9.     The Burlington Area School District School Board is organized and operated according to the laws of the State of Wisconsin.

10.    After several years of speaking out, both verbally and in writing, about the issue of public concern, namely, the racially hostile environment that existed and flourished at the BASD, on March 26, 2020 Garbade submitted an official "Discrimination Complaint Form" to the designated complaint officer for the BASD, Connie Zinnen.

11.    On April 9, 2021, Assistant State Superintendent, Barbara Van Haren, PhD issued a Decision and Order, which is attached hereto as Exhibit A. The Decision and Order found among others:

    i.   A racially hostile environment existed in BASD;

    ii.  That racial harassment at BASD was severe, pervasive and persistent;

    iii. That BASD had actual notice of the racially hostile environment.

    iv.  That BASD failed to appropriately respond to the racially hostile environment;

    v.   That BASD's investigation into the racially hostile environment was not reasonable;

    vi.  That BASD's responsive actions to racial harassment were not reasonably calculated to prevent recurrence;

     vii.    That BASD's response was not reasonable because BASD often improperly put the onus on the student to respond to racial harassment;

    viii.    That BASD failed to comply with its policy and procedure in handling nondiscrimination complaints; and,

    ix.    That BASD's nondiscrimination policy and procedure do not comply with Wisconsin Administrative Code.

12.    On April 9, 2021, Assistant State Superintendent, Barbara Van Haren, PhD issued an order requiring, among others, that BASD revise its policies and procedures and procedures to ensure compliance with the Wisconsin Administrative Code. (See Exhibit A).

13.    The BASD did not appeal the April 9, 2021 Decision and Order.

14.    On May 7, 2021, the DPI reviewed the BASD's proposed corrective action plan and concluded that Garbade, or her designee, be invited to participate in the Community Equity Team described in the corrective action plan.

15.    Garbade is the President of the Burlington Coalition for Dismantling Racism (BCDR). Garbade has indicated her intention to designation a BCDR member to participate in the BASD Community Equity Team.

16.    Wishau openly criticized BCDR and publicly objected to Garbade's inclusion on BASD's Community Equity Team.

4

"Wishau said that he would resist the state requirement that BCDR be involved in BASD's anti-racism work.

"DPI 'mandate' or not," he wrote in an email, "no unelected or unaccountable bureaucrats in Madison that have ZERO vested interest or accountability to my constituents are going to force me to work with an organization or individual like that ... period."



JOURNALTIMES.COM
Burlington schools to cooperate with anti-racism group despite board member's o…

17.     On June 25, 2021, Wishau filed a baseless BASD Discrimination Complaint against Garbade, claiming Garbade violated the BASD's anti-harassment / anti-racism policy and the Civil Rights Act of 1964 "for [Garbade's] racist comments posted on social media against a protected class." The Complaint stated, "these statements and actions are further evidence to deny and or remove [Garbade] from the District's 'equity' task force." The Discrimination Complaint Form is attached hereto as Exhibit B and incorporated herein by reference.

18.     Wishau used his school district address, school district telephone number, and his official school district email address on the complaint. In doing so, he filed the Complaint in the scope of his employment as a BASD School Board member.

5

19.     By filing the Discrimination Complaint form against Garbade, Wishau abused a legal process put in place by the BASD for the purpose of documenting discrimination by students, BASD staff, and/or BASD employees.

20.     Wishau filed the Discrimination Complaint for the purpose of chilling Garbade's speech regarding a matter of public concern, namely deliberate indifference to racism.

21.     Garbade suffered emotionally and economically because of the complaint.

<u>FIRST CAUSE OF ACTION AGAINST WISHAU</u>
<u>VIOLATION OF FIRST AMENDMENT RIGHTS</u>

22.     The plaintiff realleges and incorporates the preceding paragraphs as if set forth fully herein.

23.     By engaging in the conduct set forth in this Complaint, Wishau violated Garbade's rights to free speech when Wishau filed a BASD Discrimination Complaint accusing Garbade of race discrimination as "further evidence to deny and or remove [Garbade] from the district's "equity" task force."

24.     Said violation has caused Garbade severe and permanent emotional, psychological and economic injuries.

WHEREFORE, the plaintiff demands the following relief:

A.       An award of compensatory damages against the defendant that will justly compensate the plaintiff for her emotional, psychological and economic losses.

B.       An award of punitive damages against Wishau for the willful, wanton and reckless acts she has committed against the plaintiff;

6

C.  An award of plaintiff's reasonable attorneys' fees and costs incurred in this action;

D.  Pre- and post-judgment interest; and

E.  Such other relief as the Court deems just and appropriate.

## JURY DEMAND

The plaintiff respectfully requests that this matter be tried before a jury of competent persons.

Dated this 5th day of November, 2021.

**GINGRAS THOMSEN & WACHS LLP**
Attorneys for Plaintiffs

*s/ Mark L. Thomsen*
Mark. L. Thomsen (SBN: 1018839)
Paul A. Kinne (SBN: 1021493)
Kimberly D. Sweatt (SBN: 1113323)

8150 Excelsior Drive
Madison, WI 53717
Phone: (608) 833-2632
Fax: (608) 833-2874
Email: mthomsen@gtwlawyers.com
        pkinne@gtwlawyers.com
        ksweatt@gtwlawyers.com

7

THE STATE OF WISCONSIN
BEFORE
THE STATE SUPERINTENDENT OF PUBLIC INSTRUCTION

| In the Matter of Pupil Nondiscrimination Appeal, Darnisha Garbade v. Burlington Area School District | DECISION AND ORDER<br><br>DPI Case No.  20-PDA-02 |
| --- | --- |

## I.    NATURE OF THE APPEAL AND PROCEDURAL HISTORY

This is an appeal to the State Superintendent of Public Instruction pursuant to Wis. Stat. § 118.13(2)(b). On March 26, 2020, Ms. Darnisha Garbade, on behalf of her children, submitted a "Discrimination Complaint Form" to the designated complaint officer for the Burlington Area School District (BASD). On July 20, 2020, Ms. Garbade filed an appeal with the State Superintendent. Pursuant to Wis. Admin. Code § PI 9.08(1)(a)5., the matter was referred back to BASD as it was still under consideration by the BASD Board.

On August 4, 2020, Attorney Saveon Grenell, engaged by BASD to conduct an investigation into Ms. Garbade's Complaint, issued an Investigation Report to Superintendent Stephen Plank and Assistant Superintendent Connie Zinnen. On the same date, Attorney Grenell sent a letter to Ms. Garbade summarizing the investigation and identifying his conclusions. Specifically, the conclusion was that:

> there is no direct evidence or sufficient circumstantial evidence that the District, by or through its employees, discriminated against your daughter on the basis of race or otherwise, in violation of the District's Nondiscrimination or Harassment policies. There is also no evidence that the District has encouraged racism or engaged in racist practices.

The letter identified that Superintendent Plank had adopted Attorney Grenell's findings and conclusions. Sometime thereafter, Ms. Garbade apparently appealed Superintendent Plank's

1

**Exhibit A**

decision to the Board. A private conference between the Board and Ms. Garbade was held on August 19, 2020. On September 1, 2020, the Board issued a written answer indicating it was upholding Superintendent Plank's adoption of the Investigation Report.

Ms. Garbade, by counsel, appealed the Board's September 1, 2020 decision. As that decision was a negative determination of the board properly before the State Superintendent, the appeal was ripe for consideration and a briefing schedule was issued. The briefing schedule directed that the District should file the record of the matter, which should consist of, at a minimum: "records relating to the complaint, including investigative notes; copies of any and all of the District's pupil nondiscrimination policies and complaint procedures in effect during the 2019-20 school year; and any and all other documents related to the complaint or the allegations." The District submitted its record. Briefing followed in the form of an initial brief from Ms. Garbade, a responsive brief from BASD and a reply brief from Ms. Garbade.

## II.    STANDARD OF REVIEW

Section 118.13 of the Wisconsin Statutes provides that no person may be denied participation in, be denied the benefits of or be discriminated against in any curricular, or other program or activity because of the person's race. Section PI 9.02(5) of the Wisconsin Administrative Code defines "discrimination" to include any action, policy or practice which is detrimental to a person and differentiates or distinguishes among persons, or which limits or denies them opportunities, privileges, roles, or rewards based, in whole or in part, on their race.

The Department of Public Instruction (hereinafter "DPI") reviews appeals of districts' final determinations of pupil nondiscrimination complaints pursuant to Wis. Stat. § 118.13(3)(a)1. and Wis. Admin. Code § PI 9.08(1)(a)1. DPI's review of discrimination allegations under Wis. Stat. § 118.13 is informed by guidance promulgated by the Department of Education, Office for Civil

2

Rights (OCR) which provides an investigative approach and standards for determining whether discrimination occurred under analogous federal law. *See generally Racial Incidents and Harassment Against Students at Educational Institutions; Investigative Guidance*, F.R. Doc. No. 94-5531 (1994). A school district has a general duty to provide a nondiscriminatory educational environment. *Id*. at 3. "The type of environment that is tolerated or encouraged by or at a school can therefore send a particularly strong signal to, and serve as an influential lesson for, its students." *Id*. Discrimination occurs when a district

> has created or is responsible for a racially hostile environment[,] i.e., harassing conduct (e.g., physical, verbal, graphic, or written) that is sufficiently severe, pervasive or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the services, activities or privileges provided by a [district]. A [district] has subjected an individual to different treatment on the basis of race if it has effectively caused, encouraged[,] accepted, tolerated or failed to correct a racially hostile environment of which it has actual or constructive notice.

*Id*. DPI adopts the standard promulgated in guidance by OCR, which provides for a finding of discrimination when: 1) a racially hostile environment exists; 2) the district had actual or constructive notice of the racially hostile environment; and 3) the district failed to adequately redress the racially hostile environment. *Id*.

BASD argues that the appropriate standard to be applied to the district's response to a racially hostile environment is merely whether the district was "deliberately indifferent". A district's actions in response to racial harassment are deliberately indifferent only if they were clearly unreasonable in light of the known circumstances. *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 (2nd Cir. 2012) (citing *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999)). In the educational context, the deliberately indifferent standard arises out of the tenet that "judges make poor vice principals" and courts should refrain from second-guessing disciplinary decisions made by school administrators. *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d

3

982, 996-97 (5th Cir. 2014). Unlike a judge, DPI is a regulatory agency uniquely suited to exercise oversight of districts with respect to the actions taken in response to discrimination. As such, the standards promulgated by OCR, rather than reviewing courts, are more properly applied here.

In accordance with Wis. Admin. Code §§ PI 1.04(5), (9), DPI's decision is based on a review of the record developed by the district during its investigation into the underlying complaint; DPI is necessarily limited to the record offered by BASD on appeal. DPI will conclude discrimination occurred or did not occur when the evidence in the record supports such a finding. DPI may also conclude that the evidence in the record does not support any finding.

## III. UNDERLYING PROCEDURAL HISTORY AND ALLEGATIONS

The Grievance Procedure which governs BASD's review of discrimination complaints requires that the complainant complete a specific "discrimination complaint form" found on the district web site. *See* BASD Administrative Regulation R-112. Ms. Garbade submitted her March 26, 2020, Complaint via email with an attached completed discrimination complaint form. In the body of the email Ms. Garbade included further allegations of discrimination, including three particular incidents she specifically mentioned as "an extension of [her] official complaint" because there was not enough space on the form. [1]

The allegations made by Ms. Garbade span the years 2016 through 2020 and were made on behalf of her children; hereinafter these children are referred to as Student A and Student B. During this time period: Student A progressed from Grade 3 to Grade 6 and grew from seven years

---

[1] The BASD "Discrimination Complaint Form" provides five single-spaced lines in which the complainant is to make their "Statement of complaint", including the "type of discrimination charged and the specific incident(s) in which [they] occurred".

4

old to ten years old; and Student B progressed from Grade 6 to Grade 9 and grew from eleven years old to fifteen years old.

The "Discrimination Complaint Form" alleges that her children were: 1) subjected to verbal harassment, *e.g.*, being called "nigger[2] on multiple occasions" and told that "people are like jellybeans[,] no one likes the black ones"; 2) detained and interrogated by BASD staff when harmed by white students; 3) told by a principal "about a black kid in [M]ilwaukee who was shot and killed by the police"; and 4) physically assaulted, *e.g.*, spit on and pushed down stairs.

The body of the March 26, 2020, email contains the following allegations: 1) the principal of Student A's school discriminated against her in October 2017 by falsely accusing Student A of bringing a toy gun to school with the intent to harm others; 2) Student A was threatened by a white student (Student Z) who told Student A he had access to guns and would kill her and then, after Student A reported this incident, Student A was retaliated against by Student Z and others; 3) the principal of Student A's school discriminated against her in February 2019 when Student A was spit on and hit by a white student (Student Y) but Student A was detained and interrogated; 4) BASD repeatedly failed to include Ms. Garbade's previous discrimination complaints in its required reporting to DPI; and 5) suspension rates for Black students were 25 times higher than suspension rates for white students.

On April 7, 2020, after Attorney Grenell's investigation had commenced, Ms. Garbade sent an email to him which detailed additional "racial discrimination complaints." She reiterated that there was not enough room on the complaint form to detail all the incidents of racial discrimination that had occurred in the district. According to the Investigation Report, Attorney Grenell interviewed or received information from the following individuals: Ms. Garbade; Principal Scott

---

[2] This Decision and Order contains direct quotes of offensive racial slurs. These slurs are repeated verbatim in order to convey the serious nature of the incidents in question.

Schimmel; Principal Jacqueline Syens; and Assistant Superintendent Connie Zinnen. No students or other staff of BASD were interviewed.

Some of these allegations are discrete incidents which can be addressed accordingly. Some can be consolidated into a general allegation that a racially hostile environment existed in BASD and BASD failed to appropriately respond to the hostile environment.

## IV. DISCRETE ALLEGATIONS THAT BASD DISCRIMINATED AGAINST STUDENT A BY TREATING HER DIFFERENTLY THAN SIMILARLY-SITUATED STUDENTS.

Discrimination occurs when district employees, acting within the scope of their official duties, treat a student differently on the basis of their race without a legitimate, nondiscriminatory reason. A "standard different treatment analysis" should be applied to allegations of racial discrimination by district employees or agents. F.R. Doc. No. 94-5531 at 2. Essentially, when a student has been treated differently than other similarly-situated students of other races, the district must show legitimate, nondiscriminatory reasons for the treatment. *Id.* at 7. These asserted reasons cannot be a "mere pretext" for discrimination. *Id.*

### A. BASD Discriminated Against Student A When It Disciplined Her Differently Than a Similarly-Situated White Student With No Legitimate, Nondiscriminatory Reason.

On or about October 4, 2017, Student A brought a toy airsoft gun to school for show and tell day. She apparently played with it on the playground around other students and also had it visible on the bus. The toy gun was confiscated by a bus driver, who reported the incident to the school principal, Jacqueline Syens. Principal Syens sent an email on October 5, 2017, to all school parents advising that a student had an unloaded BB gun on the bus, that it was retrieved by a bus driver and "no children were in any danger at any time and disciplinary actions have been taken". While questioning Student A about why she brought the toy gun to school, it is undisputed that

Principal Syens referred to a Black child who was shot and killed by the police while playing with a toy gun. Student A was suspended for one day. On October 10, 2017, Principal Syens sent another email to all school parents clarifying that the toy gun was an airsoft gun and not a BB gun and reminding families of District Policy 443.6 which states no student may possess a weapon or imitation weapon on school premises or in school buses. Neither email identified Student A by name or other identifiable information.

Included in the record is a "Student Discipline Report" which apparently reflects all discipline incidents involving weapons documented in BASD during the relevant school years (2016 – 2020). Seven such incidents involving six students are documented during this time period. The record does not reflect the race of any of the students involved in these weapons incidents. Although it is undisputed Student A was suspended for one day as a result, there is no entry in the student discipline report (or any other contemporaneous document of the incident in the record beyond the emails sent by Principal Syens) regarding the October 2017 incident involving Student A. Examples of weapons incidents listed in the student discipline report include: a seventh grader who brought a knife to school and served one day of out-of-school suspension; and a sixth grader who brought a pocket knife to school and served one day of in-school suspension. The only other documented incident involving a gun (or imitation gun) involved a hunting rifle discovered in a student's vehicle during a sweep of the parking lot; the student served two days of out-of-school suspension.

The record reflects the discipline imposed on Student A for bringing the toy gun to school was generally equivalent to discipline imposed on all students in BASD who brought weapons to school. However, the most analogous weapons incident to the incident involving Student A took place during the same school year at the same school; the discipline imposed on this similarly-

7

situated student was different. In May 2018, a 4th grader (Student X) brought a jack knife to school, "show[ed] it off on the bus" and served an undocumented amount of detention. BASD identifies in its Brief that Student X is white. Because the discipline imposed on Student A was different, and more severe, than the discipline imposed on similarly-situated Student X, BASD must show legitimate, nondiscriminatory reasons for this different treatment. F.R. Doc. No. 94-5531 at 7. These reasons cannot be a "mere pretext" for discrimination. *Id*. DPI is not persuaded that there were legitimate, nondiscriminatory reasons for the more severe discipline.

In the course of her interview with Attorney Grenell, Principal Syens compared the incident with Student A to that of Student X and asserted the totality of the circumstances and the intent of the student must be taken into account when determining discipline. According to Principal Syens, Student X was not suspended because the student realized he had a jack knife in his book bag and immediately gave it to a teacher. BASD reiterates these facts in its Brief. The record does not comport with this description of the incident. According to the entry in the student discipline report:

> [i]t was brought to [staff] attention at lunch from a couple students that [Student X] had a sharp jack knife in his backpack and he was showing it off on the bus. When he was asked about it he took it out of his backpack and gave it to [staff member].

There is no meaningful difference between the incidents involving Student A and Student X. Both students apparently had no intent to harm anyone with the weapon they brought to school.[3] Both students showed the weapon to other students. Both students had the weapon confiscated only after it was discovered by adults. BASD argues in its Brief there were no similarly-situated students because no other student possessed a gun, real or imitation, on school grounds. This is incorrect

---

[3] The statement of Principal Syens recounted in the Investigation Report that intent of the student must be considered implies there was a distinction between the intent of Student A and Student X. However, there is no allegation in the record that Student A threatened or intended to harm anyone with the toy gun and, in fact, Principal Syens stated in her interview that Student A said she had no bad intentions.

(there was the incident with a hunting rifle) and also disingenuous. BASD's policy on weapons does not distinguish between knives and guns. BASD cannot on the one hand assert that it treats all students equally pursuant to that policy and on the other hand try to carve out Student A as uniquely situated because of the type of weapon she possessed. BASD has not identified any legitimate, nondiscriminatory reason that Student X, a white student, served detention while Student A, a Black student, served a suspension for substantially similar offenses.

Ms. Garbade also asserts that it was discriminatory for Principal Syens to send school-wide emails about Student A's possession of the toy gun which resulted in ostracization of, and backlash towards, Student A. The record is silent as to whether similar emails were sent for other weapons incidents or specifically for the incident involving Student X's possession of the jack knife. BASD asserts that the emails were sent simply to communicate to parents that students were safe. The record does reflect a legitimate, nondiscriminatory reason for the emails sent about Student A: news of the incident was already out on Facebook and there was a need to provide information to parents. Given these facts, DPI cannot conclude that the reasons offered by BASD for sending the emails were a mere pretext for discrimination.

### B. BASD Did Not Discriminate Against Student A During Its Investigation of a February 2019 Altercation.

On February 4, 2019, Student A was involved in an altercation with Student Y on the playground. Principal Scott Schimmel investigated the altercation. Ms. Garbade alleges that Principal Schimmel discriminated against Student A by defending Student Y. She also alleges that Principal Schimmel treated Student A like the perpetrator by detaining and questioning her when she was the victim. Many facts surrounding the altercation are in dispute. There are no contemporaneous documents in the record summarizing the altercation beyond the emails exchanged between Principal Schimmel and Ms. Garbade, which present differing views. The

9

Investigation Report details that Principal Schimmel viewed video of the altercation but the actual physical contact between Student Y and Student A was obscured.[4] Principal Schimmel questioned both Student A and Student Y as well as other students that were present. Based on Principal Schimmel's investigation, he came to the conclusion that Student Y did not intend to hit Student A and neither Student A nor Student Y were disciplined. There is no evidence supporting a finding that Principal Schimmel treated Student A differently than other similarly-situated students during his investigation into the altercation.[5]

### C. Based on the Record, DPI is Unable to Determine Whether BASD Discriminated Against Student A When She Was Referred to the School Resource Officer for Theft.

On March 5, 2019, Student A stole food items such as pop tarts and granola bars from other students' lunch baskets. Student A was referred for a meeting with School Resource Officer (SRO) Jodi Borchardt and served one day of in-school suspension. Student A also replaced the snacks that she took and wrote letters of apology to the students. As noted in the Investigation Report, Ms. Garbade was not opposed to Student A meeting with the SRO as a consequence for her theft but questioned whether white students would be referred to the SRO in similar circumstances. Ms. Garbade also recounted in correspondence to Attorney Grenell that the SRO told her Student Z – the student that threatened to kill Student A on the bus – was not referred to the SRO and should have been. The SRO was not interviewed during the investigation. BASD does not have any written policies, procedures or guidance for staff on when to involve the SRO. Principal Schimmel stated that "threats, theft, and online bullying" are behaviors that will likely result in police contact.

---

[4] The video of the incident was also viewed at some point by Ms. Garbade, who apparently also identified the footage was inconclusive, but the footage was no longer available for viewing by Attorney Grenell during his investigation.
[5] However, certain aspects of Principal Schimmel's actions with respect to this investigation will be discussed in more detail later in the Decision.

10

The record does not contain any other entry in a student discipline report, besides the entry for Student A, which identifies the offense as theft. A review of the other entries in student discipline reports in the record reveal inconsistency in when the SRO is involved.[6] Out of seven weapons incidents, two resulted in police involvement. Out of nineteen bullying incidents, two resulted in police involvement. The entry in a student discipline report for Student Z's threat to Student A confirms that Student Z was not referred to the SRO. Attorney Grenell ultimately found "[b]ased on the review of the records made available to me and a totality of the circumstances, I **cannot substantiate** the allegation that students of color are referred to the police liaison officer more often than White students."[7] Based on the record, DPI is unable to make a determination as to whether BASD discriminated against Student A when it referred her to the SRO and whether BASD regularly discriminates against students on the basis of race by using race as a factor when making referrals to the SRO. The Investigation Report contains recommendations to "ensure there is uniformity and equity in the utilization of law enforcement within the District". DPI agrees this is an area of concern that BASD should address.

## V.    BASD FAILED TO RESPOND ADEQUATELY TO REDRESS THE HOSTILE RACIAL ENVIRONMENT WHICH EXISTED IN THE DISTRICT.

Discrimination occurs when: 1) a racially hostile environment exists; 2) the district had actual or constructive notice of the racially hostile environment; and 3) the district failed to adequately redress the racially hostile environment. F.R. Doc. No. 94-5531 at 3. Many of the allegations raised by Ms. Garbade can be consolidated into a general allegation that there was a racially hostile environment at BASD which BASD failed to adequately redress.

---

[6] Also, as previously noted, most of the entries in the student discipline reports available do not identify the race of the students involved.
[7] It appears from this comment that Attorney Grenell believes there may have been District records that would have assisted him in making further conclusions about the use of SROs. It is unclear why he did not request them.

### A. A Racially Hostile Environment Existed in BASD.

A racially hostile environment exists in a district when racial harassment is "severe, pervasive or persistent". F.R. Doc. No. 94-5531 at 3; *see also Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). In determining whether the severe, pervasive or persistent standard is met, many factors are considered, including "the context, nature, scope, frequency, duration and location of racial incidents, as well as the identity, number and relationships of persons involved." F.R. Doc. No. 94-5531 at 3. The age of the student also should be taken into account, as younger students are more impressionable and incidents that may not be considered harmful to older students may be severe and harmful to their younger counterparts. "Particularly for young children in their formative years of development, therefore, the severe, persistent standard must be understood in light of the age and impressionability of the students involved". *Id*. A racially hostile environment can result from a single incident if it is sufficiently severe, such as injury or threats. *Id.* at 4. With respect to identity of the persons involved, the effect of racially-based conduct by a district employee may have a greater impact on a student than the same conduct by another student and the effect of racially-based conduct by a group of students may have a greater impact than by a single student. *Id*. Importantly, "racial acts need not be targeted at the complainant in order to create a racially hostile environment. The acts may be directed at anyone." *Id.*

OCR resolution documents – which are issued as a result of discrimination complaints investigated by OCR – are instructive in showing how these factors are applied in real-world educational environments. In 2018, OCR investigated complaints of racial discrimination in the School District of River Falls, Wisconsin. *See School District of River Falls*, No. 05-18-1304 (U.S. Dep't of Educ. Office for Civ. Rts. Oct. 31, 2018), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05181304-a.pdf. OCR found

that a hostile racial environment existed where, over the course of a semester, an African-American student was taunted regularly on the basis of her African-American features. *Id.* at 3. This included comments about the student's hair, nose and skin color. *Id.* These comments often left the student "visibly shaken". *Id.* A comment was also made to another African-American student that he could not do something other students could do "because he is black and they are white". *Id.* at 4.

Further guidance is found in other recent cases involving OCR investigations. For instance, OCR and a district reached a resolution short of a formal finding and the district agreed to take actions to bring the district into compliance over a complaint there was a racially hostile environment because a student had identified multiple uses of "the N-word" by other students at his school. *See Northwest Allen County Schools*, No. 05-20-1020 (U.S. Dep't of Educ. Office for Civ. Rts. May 28, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05201020-a.pdf. Also in 2020, OCR and a district reached a resolution over racial harassment in the course of one school year, and specifically an incident of two students calling a group of four elementary school children "burnt chicken nigglets". *See Mountain Iron-Buhl Public School District #712*, No. 05-20-1187 (U.S. Dep't of Educ. Office for Civ. Rts. July 14, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05201187-a.pdf. Finally, a resolution was reached in a case involving allegations a white student physically assaulted an African-American student, called him "the 'n-word'" and told him "black people smell". *See Prospect Heights School District 23*, No. 05-16-1067, (U.S. Dep't of Educ. Office for Civ. Rts. Nov. 25, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05161067-a.pdf.

i. <u>There Were, At a Minimum, Nineteen Incidents of Racial Harassment at BASD During the Years 2016 Through 2020.</u>

A student discipline report is included in the record which apparently reflects nineteen discipline incidents involving "BULLYING RACE" documented in BASD during the relevant school years (2016 – 2020).

- In September 2016, an eighth grader called another student a "nigger" while lining up to leave class. This comment was overhead by other students.
- In December 2016, a ninth grader used "racial remarks toward another student".
- In December 2016, a ninth grader said that another student was "as dark as burnt toast".
- In January 2017, a tenth grader made "racial comments and told a Spanish student that he hated Spanish students."
- In February 2017, a tenth grader "used ethnic and sexual references/picture in a message sent to another student".
- In March 2017, a ninth grader made unspecified "racial comments" on the bus that were apparently so significant that police contact was warranted.
- In March 2017, an eleventh grader made "racial comments" in the classroom.
- In April 2017, a tenth grader "called an African-American student chocolate and a Hispanic student vanilla loudly in front of the whole class".
- In February 2018, a seventh grader yelled "Mexicans are idiots, go eat your tacos somewhere else" at other students.
- In March 2018, a seventh grader told a Hispanic student "Mexicans are sneaking drugs into the US. That's why Trump is building a wall."
- In May 2018, a tenth grader used an "offensive racial slur towards another student."
- In November 2018, a sixth grader called another student "the 'n-word' and [said] he didn't care if he was being racist."
- In November 2018, a ninth grader called another student a "racial slur and pushed them".
- In February 2019, a seventh grader "repeatedly [made] racial remarks to another student."
- In March 2019, a seventh grader called out to a female student "you ugly! You an ugly ho!"
- In April 2019, a seventh grader shoved a student and called the student a "nigger".
- In November 2019, an eleventh grader said "the N-word" to two Black students approximately five times as they walked past.
- In February 2020, a fifth grader said to two other students "I hate Mexicans like you, I hate everything about them" and called them "Mexican whores".
- In February 2020, a ninth grader said "watch out, here comes another one of those monkeys" about a Black student.

14

ii. Additional Incidents of Racial Harassment Occurred from 2016 Through 2020, but DPI is Unable to Determine the Exact Number and Severity of Additional Incidents Due to a Lack of Investigation and Documentation in the Record.

Ms. Garbade's Complaint asserts many specific instances of verbal racial harassment, including that her children were: "called 'nigger' on multiple occasions"; called "black girl"; and told that "people are like jelly beans[,] no one likes the black ones". In her April 7, 2020, email to Attorney Grenell, Ms. Garbade provided specific dates of these incidents and the names of the alleged perpetrators (in addition to dates and names for a multitude of other incidents). The Investigation Report does not address these specific incidents.[8] The Investigation Report also fails to address the global allegation that racial harassment was ever-present in BASD, beyond the conclusory statement:

> there is no evidence that the District has perpetuated race discrimination on systemic and individual levels and there is no actual evidence the District has encouraged racism or engaged in racist practices. However, review of disciplinary records from 2016 - 2020 related to remarks regarding race by students in the District, revealed there has not been uniformity in the severity of punishment given to students who make remarks based on race.

Given that BASD has neither refuted these specific allegations of explicitly racial harassment nor developed evidence to refute them, DPI determines that at least these additional instances of racial harassment also occurred at BASD.

iii. DPI is Unable to Determine if Other Instances of Harassment of Student A Were Racial Harassment.

DPI assumes that, because Ms. Garbade is raising them in her Complaint, she asserts that other specific incidents involving Student A were racially-motivated and are further evidence of the racially hostile environment at BASD. Unlike verbal harassment where a racial motivation is

---

[8] None of these incidents can be clearly tied to incidents documented in entries in a student discipline report as already known to BASD and addressed as bullying based on race incidents.

inherent in the words used, it is ambiguous whether these incidents – the threat made by Student Z, the altercation with Student Y, and several instances of physical assault – were racially-motivated.

An entry in a student discipline report included in the record indicates that Student Z, documented as white, said to another student on the bus (presumably Student A), "If you don't stop annoying me, I'm going to kill you". There is no documented racial component to this threat. The Investigation Report summarizes an interview with Principal Schimmel on the matter but does not specify whether Student Z was questioned as to any racial motivation following the incident. The Report concludes there is "no record of the student making any threats to [Student A] based on her race". The Investigation Report substantiates the allegation that Student Z and other students retaliated against Student A by calling her a "snitch" but concludes "there is no indication the retaliation was based on [Student A]'s race" and notes one comment about Student A's race could not be "independently verified".[9]

With respect to the altercation with Student Y, the Investigation Report does specifically note that:

> [b]ecause the allegations were related to race, I inquired into the race of the other student involved. Mr. Schimmel reported that the other student is biracial, but noted that he is unsure whether the student self-identifies as biracial.

However, there is no indication that Principal Schimmel asked any questions to determine whether the altercation was racially-motivated. Just as with the allegations of verbal harassment, BASD has not developed sufficient evidence to specifically refute Ms. Garbade's version of these events. Based on this record, DPI is unable to determine if these incidents were racial harassment.

---

[9] The Investigation Report does not note what steps were taken to attempt verification.

16

iv. DPI Determines That Racial Harassment at BASD was Severe, Pervasive and Persistent.

DPI determines that racial harassment at BASD was severe, pervasive and persistent during the period from 2016 until the Complaint was filed in 2020. The environment at BASD was akin to the environment in River Falls, where OCR determined a racially hostile environment existed where a student was "subjected to frequent racial taunting" over the course of one semester. *School District of River Falls* at 10. OCR notes that "the comments in question were not severe racial epithets" but were persistent and pervasive. The environment at BASD was also akin to environments at districts where OCR did not reach a formal determination of a racially hostile environment, but reached resolutions with districts where: "the N-word" was used multiple times, *Northwest Allen County Schools* at 3; racial harassment was alleged over the course of one year and elementary students were called "burnt chicken nigglets", *Mountain-Iron Buhl Public School District #712* at 5; and an African-American student was called "the 'n-word'" and told "black people smell". *Prospect Heights School District 23* at 3.

At BASD, the record reflects at least nineteen instances of students subjected to racial comments and slurs over the course of four years, including eight separate instances in the 2016 – 2017 school year alone. Further, at BASD, the racial harassment often consisted of severe epithets; there are at least four documented instances of the word "nigger" being used by, and directed at, BASD students. This does not even account for the "multiple occasions" Ms. Garbade alleges in her Complaint that her children were subjected to that epithet. However, it is important to note that "racial acts need not be targeted at the complainant in order to create a racially hostile environment. The acts may be directed at anyone." F.R. Doc. No. 94-5531 at 4. As noted by OCR, a racially hostile environment can result from a single incident if it is sufficiently severe and this standard must be "understood in light of the age and impressionability of the students involved". F.R. Doc.

No. 94-5531 at 4. Student A was seven to ten years old during the relevant years. Here, where she and her fellow students were hearing racial comments and slurs on a consistent basis over the course of several years, DPI determines a racially hostile environment existed.

### B. BASD Had Actual Notice of the Racially Hostile Environment.

There is no question that BASD had actual notice of the racially hostile environment. Beyond its own student discipline reports, which reflect the incidents recited above, Ms. Garbade continually raised concerns to the District about racial harassment of her children and other students. The record reflects that, beginning in February 2019 and continuing through November 2019, Ms. Garbade was in frequent communication with Principal Schimmel regarding incidents in which Student A was being mistreated. Many of these incidents were harassment explicitly based on Student A's race; others Ms. Garbade alleged were based on racial bias. Ms. Garbade's communications: eventually included Superintendent Plank and Superintendent Smet; included speaking at Board meetings to take her concerns about the racially hostile environment at BASD directly to the Board; and expanded to reporting racial comments that were being told to her from other BASD students who wanted to remain anonymous.

### C. BASD Failed to Appropriately Respond to the Racially Hostile Environment.

Once a district has notice of a racially hostile environment, it must "take reasonable steps to eliminate it". F.R. Doc. No. 94-5531 at 5. "The appropriate response to a racially hostile environment must be tailored to redress fully the specific problems experienced at the institution as a result of the harassment. In addition, the responsive action must be reasonably calculated to prevent recurrence". *Id*. When a district learns:

> of harassment based on race by a student's peers, the [district] must investigate the incident(s) promptly and respond appropriately. The responsibility to respond to harassment based on race, when it does occur, includes taking prompt and effective action reasonably calculated to end the harassment, eliminating any hostile

18

environment that has been created, preventing it from recurring, and where appropriate, remedying the effects of the harassment on the student who was harassed. These duties are a [district]'s responsibility even if the misconduct also is covered by an anti-bullying policy, and regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

*Platteville Public Schools,* No. 05-13-1098 (U.S. Dep't of Educ. Office for Civ. Rts. Nov. 20, 2013), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/05131098-a.pdf.

OCR has provided specific guidance on what an appropriate response calculated to prevent recurrence by a district might include. With respect to individual incidents, steps may include "separating the accused harasser and the target, providing counseling for the target and/or harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed." *Dear Colleague Letter* 3, (U.S. Dep't of Educ. Office for Civ. Rts. Oct. 26, 2010), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf. However, the response should not end with addressing specific incidents. Depending on the extent of the harassment, a district "may need to provide training or other interventions not only for the perpetrators, but also for the larger school community, to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond." *Id*. An effective response may need to include issuance of new policies against harassment and procedures by which complaints may be made. *Id*. The district also must take steps to prevent further harassment of complainants and prevent retaliation. *Id.* "At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conducting follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems." *Id*.

OCR has even offered suggestions on reasonable response in the form of a checklist. *Checklist for a Comprehensive Approach to Addressing Harassment* (U.S. Dep't of Educ. Office

for Civ. Rts.), https://www2.ed.gov/policy/rights/guid/ocr/checklist.html. Additional appropriate steps to form an appropriate response include: "creating an effective anti-harassment program in consultation with parents, students, and community groups"; using the district's curriculum to "foster respect and appreciation for diversity"; staff training and professional development programs to support the district's anti-harassment efforts; development of guidelines and procedures for collaboration with law enforcement officials; and regular assessment of the effectiveness of the district's anti-harassment efforts. *Id.*

OCR's specific findings in the River Falls investigation once again are helpful to see the real-world application of these principles. There, the parent raised the frequent racial taunting suffered by her daughter to the district; thereafter, the principal met with the parents to discuss further but offered no solutions other than to speak with the student doing the taunting. *School District of River Falls* at 5. The victim was offered support through the school counselor, including regular check-ins. *Id.* The parent continued to raise concerns to the principal about the ongoing racial harassment, but the principal never forwarded the matter to the superintendent or initiated any formal investigation until the parent indicated the student would withdraw from the district. *Id*. at 6-8. The district's formal response to the allegations of harassment was a finding that staff took measures to address the concerns and there was no evidence staff ignored the issues or allowed the comments to persist. *Id.* at 8. The district asserted it could not "monitor the activities of students at all times and eliminate incidents of bullying". *Id*. On these facts, OCR determined that "the District failed to take effective action to immediately stop the harassment, prevent its recurrence, and remedy its effect on" the student. *Id*. at 11. OCR specifically noted that although the district addressed reports of harassment as they arose in a "concerned and caring fashion", the district's interventions were not effective when viewed cumulatively. *Id*. While each allegation

was addressed, no formal investigation was launched and there were no steps taken to prevent the harassment from recurring. *Id.* OCR further noted that the counseling offered to the student was "intended not to help her overcome the effects of the harassment, but to teach her self-esteem and self-advocacy". *Id.*

The OCR's investigation in Platteville also provides guidance on what constitutes failure to appropriately respond. There, the complaint alleged the district was aware of racial harassment but did not take appropriate action to respond. *Platteville Public Schools* at 1. Multiple students were substantiated by the district as having made derogatory racial remarks to African-American students. *Id.* at 13. Also, one African-American student was involved in misconduct incidents in which he asserted white students were the aggressors engaging in racial harassment with the intent to push him to retaliate so that he would then be disciplined. *Id.* at 8. In finding that the district failed to respond appropriately, OCR noted the district failed to offer any remedies to the victims. *Id.* at 13. Further, the district responded to the harassing conduct by placing the onus on the victims to respond. *Id.* The principal told the student involved in misconduct incidents that the student needed "to show other students what it was like to be a 'black man' when advising him to ignore other students' efforts to antagonize him". *Id.* OCR specifically stated this comment created a hostile environment for the student. *Id.* The principal also suggested students needed to be taught how to keep themselves from responding to harassment and to simply "turn the page" in the face of harassment. *Id.* OCR identified that "[a]lthough the School investigated each incident of alleged harassment, the School did not take sufficient responsive action because the incidents of harassment continued". *Id.* Further, the district "conveyed a message to the two students that… it was their responsibility to combat the harassment or negative stereotypes." *Id.*

OCR has expressed concern over the sufficiency of other district responses, including: a failure to create and maintain documentation of responses to complaints of racial harassment, *Mountain-Iron Buhl Public School District #712* at 6; offering a "trusted adult" to whom students suffering from racial harassment could report incidents, but not otherwise offering the students "counseling or other remedies" following substantiated incidents, *Northwest Allen County Schools* at 3; and not implementing training for students and staff regarding ongoing racial harassment and reports of racially offensive language. *Id.*

OCR has also expressed concerns specifically over district investigations that focused on bullying to the exclusion of considering whether racial harassment occurred. *See Hampton School District / SAU 90,* No. 01-19-1290, (U.S. Dep't of Educ. Office for Civ. Rts. Feb. 14, 2020), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/more/01191290-a.pdf. In that matter, the parent raised concerns over racial comments made to their child. *Id*. at 2. However, the investigation focused solely on bullying; OCR noted the information gathered indicated that the district may not have considered whether these incidents constituted racial harassment, nor investigated the impact of the comments on the victim or any other students, focusing instead on what disciplinary action was necessary. *Id.* at 4.

   i.   BASD's Investigation Into the Racially Hostile Environment Was Not Reasonable.

A district's duty to investigate racial harassment and whether a racially hostile environment existed is not triggered only by a formal complaint. *Platteville Public Schools* at 4. Here, the duty arose for BASD as early as the first documented instance of a racial slur was used in the district. Yet, there is little evidence in the record that BASD conducted any investigation into a larger problem at the district starting in 2016 or even in February 2019 when it is documented Ms. Garbade raised allegations regarding racial harassment, including that Student A has "been hit so

many times & ha[s] had to deal with so many racial slurs". In the extended correspondence between Ms. Garbade and BASD that followed until March 2020, she continued to raise allegations of a racially hostile environment until she filed her formal Complaint. Between February 2019 and March 2020, BASD seemingly only responded to certain discrete allegations involving Student A, but did not take the further step of considering, or investigating, whether the environment in BASD was racially hostile for Student A in particular or her peers globally. Even in the context of the investigation of specific allegations, as discussed in section V.A.iii., there is little evidence that racial motivation was considered or explored by BASD. There is also no evidence in the record that many of Ms. Garbade's allegations, both those made in her email correspondence and those made in her formal Complaint, were ever investigated at all. These include allegations Student A was pushed down the stairs and other incidents of physical assault Ms. Garbade implies were racially-motivated.[10] During the lengthy correspondence between Ms. Garbade and BASD, the district never pointed Ms. Garbade to the formal process for discrimination complaints. BASD's response to the racially hostile environment in its district was similar to that of River Falls, which was determined to be inadequate by OCR. Certain individual allegations were addressed, but there was no formal investigation into the global environment of racial harassment. Also, like the response of Hampton, BASD seemingly focused its response on imposing discipline on individual students to the exclusion of any consideration of the possible racial components of the incidents involving Student A.

---

[10] The record reflects that Principal Schimmel advised Ms. Garbade in February 2019 that in response to the issues she had raised, "I have investigated and/or acted in response with consequences and/or steps to address the situations". The record contains some evidence that to confirm his assertion that certain incidents were investigated, *e.g.*, the entry in a student discipline report resulting from Student Y's threat that he would kill Student A, but is largely silent as to any investigation and response that occurred.

DPI also has concerns over the formal investigation that was ultimately conducted as a result of Ms. Garbade's Complaint. The Complaint clearly includes allegations that there was a racially hostile environment present at BASD, yet the investigation focused only on certain discrete incidents raised by Ms. Garbade. As noted previously, *see* section V.A.ii., there is one conclusory statement in the Investigation Report addressing the racially hostile environment. Relevant witnesses were not interviewed, including the SRO. No BASD students were interviewed. In combination with the BASD's lack of investigation prior to March 2020, the result is a lack of evidence in the record reflecting any consideration of the racially hostile environment present in BASD. This failure to consider and investigate is clearly not a reasonable and appropriate response given the persistent racial harassment in the district.

ii. <u>BASD's Responsive Actions to Racial Harassment Were Not Reasonably Calculated to Prevent Recurrence.</u>

BASD did take actions to address racial harassment as it occurred within the district, but these actions were not reasonably calculated to prevent recurrence and were not effective when viewed cumulatively. The record reflects that discipline was imposed on those students documented to have engaged in racial bullying. However, as the Investigation Report notes, there was no "uniformity in the severity of punishment given to students who make remarks based on race." In fact, the difference in discipline imposed for these incidents is stark. For instance, an eighth grader who called another student "nigger" was given one day of lunch/recess detention while an eleventh grader who said "the N-word" to two students five times was given two days of out-of-school suspension. Of the nineteen documented incidents of racial bullying, only two served out-of-school suspension and one was referred for police contact; most received detention or one day or less of in-school suspension. It is logical that use of racial slurs and comments in the district continued when the consequences for students doing so were almost non-existent.

24

More importantly, BASD's response to pervasive racial harassment seemingly ended after discipline was imposed. Just like in River Falls and Platteville, where the district addressed certain instances of harassment as they arose, there is no evidence in the record that BASD took steps to prevent the <u>recurrence</u> of the harassment. There was a significant absence of any district-wide and systematic consideration of how to address underlying causes of the harassment and ensure such racial harassment would not continue. As noted above, OCR has provided many examples of steps that encompass an appropriate response to pervasive racial harassment. There is scant evidence in the record that BASD took any of these steps from 2016 to March 2020.[11] BASD did not: provide training to students, staff and the school community on recognizing recurring harassment and how to respond; issue new policies on harassment or refine its procedures on harassment complaints; provide Ms. Garbade clarity on how to formally report discrimination complaints; develop guidelines for collaboration with law enforcement officials; or work to develop an effective anti-harassment program. None of these strategies are necessarily mandatory to address the pervasive racial harassment in this case, but the record demonstrates that BASD's response was insufficient.

The correspondence between Ms. Garbade and BASD reflects many ways in which the district claimed it was responding to racial issues in BASD. In March 2019, BASD agreed with Ms. Garbade's suggestion that a committee on diversity and inclusion should be formed within the district. However, no demonstrable progress was made on forming this committee thereafter. In November 2019, Ms. Garbade was still inquiring as to what steps, if any, had been taken to start that process. Principal Schimmel suggested in February 2019 to Ms. Garbade that racial issues were being addressed through "Monday Meeting lessons" focused on diversity and respect and a "Compassion Day" led by students focused on compassion for others and inclusion. Ms. Garbade

---

[11] BASD has presented evidence regarding steps it has taken since Ms. Garbade's formal Complaint was resolved. Those will be addressed in the Order, below.

asked several follow-up questions about these events, including what the goals of the events were and whether the participants were racially and culturally diverse. The record does not contain any further information on if, or how, these events addressed the ongoing racial harassment. From April 2019 through the end of the school year, Student A "checked in" daily with either Principal Schimmel or a school counselor; any peer or staff concerns Student A raised were documented. However, the "results" documented for these concerns were what steps were taken to improve Student A's reaction. It is unclear whether Student A received formal counseling or other remedies in addition to these check-ins.

BASD's response was substantially similar to districts where OCR either specifically found a district failed to respond appropriately or expressed concerns over the response. Like in Hampton, even though certain incidents were investigated, there was usually no exploration as to whether the incidents constituted racial harassment and the focus was on bullying in general and disciplining students without consideration of how the incidents impacted Student A. Similarly, like in Mountain-Iron Buhl, there was a lack of documentation supporting responses to incidents of racial harassment. Just as in River Falls and Northwest Allen, Student A was offered support in the form of check-ins with staff, but no accompanying counseling or other remedies in the face of racial harassment. Finally, like Northwest Allen, there was no implementation of district-wide training for students or staff in response to ongoing reports of racial harassment. Based on its review of the record, DPI concludes that the responsive actions BASD did take were not reasonably calculated to prevent recurrence of racial harassment within the district.

iii. **BASD's Response Was Not Reasonable Because BASD Often Improperly Put the Onus on Student A to Respond to Racial Harassment.**

BASD also failed to reasonably respond when it improperly shifted the burden to Student A to consider how she should act in the face of racial harassment, rather than addressing how the harassers should act differently. During the course of Principal Schimmel's investigation into the altercation between Student A and Student Y, Ms. Garbade asserted in contemporaneous emails that Principal Schimmel: said "things keep happening to" Student A; explained what the consequences would have been <u>for Student A</u> if the altercation had progressed; and told her to "walk away" from such incidents. These same statements were apparently not made to Student Y. In the Investigation Report, Principal Schimmel acknowledged he asked Student A "what she believed she could have done differently" and stated this was a "restorative justice and conflict resolution technique" but conceded he had no formal training in restorative justice.

Email correspondence between Ms. Garbade and Principal Schimmel also documents significant issues experienced by Student A with a group of students on the bus, including Student Z. The record reflects that Student Z was disciplined for threatening Student A and the investigation substantiated that Student Z and others thereafter retaliated against Student A for reporting the threat. In the Investigation Report, Attorney Grenell notes "Mr. Schimmel removed two students from the bus that [Student A] rode. In addition, the District involved the Burlington Police Department, and the Department issued Cease and Desist Contracts to the other students." This recitation of facts does not acknowledge that it appears that Ms. Garbade, and not BASD, was the first to report this ongoing issue to the police. Further, in addition to the cease-and-desist contracts "issued" to the other students involved, Student A was asked to sign a contract as well. Student A ultimately did not sign after Ms. Garbade asserted it was inappropriate that the target of bullying and racial harassment be asked to cease and desist.

27

Even during the incident where Student A brought a toy gun to school, and justifiably was asked to consider how her actions could have harmed others, Principal Syens took it a step further and introduced racial overtones and Student A's responsibility for the actions of others by telling her the story of a Black child killed by the police while playing with a toy gun. This statement implied Student A would be responsible if she was harmed as a result of someone else's mistaken impression about Student A's intentions. Principal Syens asserts she intended this to be a teaching moment about gun safety, but the Investigation Report acknowledges this comment was concerning given Student A's age.

These incidents reflect a persistent shifting of the obligation <u>from</u> both the district and the perpetrators <u>to</u> Student A to bear responsibility for the racially hostile environment. Just as in Platteville, BASD asked Student A to consider and change her own behavior to end the harassment while failing to effectively address the individuals perpetrating the harassment. BASD continually treated Student A as part of the problem instead of the target of the concerning behavior. This both perpetuated the racially hostile environment and is evidence of BASD's failure to appropriately respond to the racially hostile environment.

## VI. BASD FAILED TO COMPLY WITH ITS POLICY AND PROCEDURE IN HANDLING NONDISCRIMINATION COMPLAINTS.

BASD's Nondiscrimination Policy, Code No. 112, adopts the provisions of Wis. Stat. § 118.13 which prohibit discrimination based on legally-protected characteristics. BASD's Nondiscrimination Procedure, Code No. R-112, provides a bare bones process for the filing and resolution of complaints: "[i]n the event that an individual wishes to file a complaint regarding discrimination the following procedure must be followed. The district will follow due process standards and provide for the prompt and equitable resolution of complaints alleging any action prohibited by civil rights regulations." To commence a complaint, the procedure requires the

"discrimination complaint form" be completed and submitted to the Assistant Superintendent. There is no further detail provided on what must be contained in the form; the procedure does not require any level of detail or specificity in the allegations.

There is no dispute that Ms. Garbade properly submitted her complaint to BASD in accordance with this procedure. The allegations contained on the complaint form itself as well as in her accompanying email (it was necessary for her to include additional allegations in her email given the lack of space on the form) are detailed in Section III above. While it is true the bulk of the specific allegations pertain to incidents involving Student A, the complaint form specifically provides that Ms. Garbade is making it on behalf of her <u>children</u>. The Complaint clearly asserts that her children – both Student A and Student B – have been subjected to racial slurs. Nonetheless, the investigation wholly ignored any allegations regarding Student B, who was attending Burlington Area High School at the time the Complaint was submitted. The Investigation Report specifically states "[t]he allegations related to the high school were not the subject of the Complaint and therefore not within the scope of my investigation." Further, as detailed in section V.C.i., the investigation did not sufficiently address allegations of a hostile environment at-large in BASD.

BASD has also taken inconsistent positions on how it uses its nondiscrimination policy and procedure to report discrimination complaints to DPI. Wis. Admin. Code § PI 9.07(2) requires school boards to annually report to DPI the name of the employee designated to receive complaints regarding discrimination and the number of complaints received during the year. The DPI form utilized by districts to make this annual report asks "[d]id the district receive any verbal or written complaints based on pupil discrimination and/or harassment"? For the years 2016 through 2019, BASD reported to DPI that it received zero discrimination or harassment complaints. This issue was previously raised to DPI outside of the scope of this Complaint and DPI exercised its oversight authority under Wis. Admin. Code § PI 9.08(2)(c) to determine whether BASD was complying

with its own established policies and procedures in reporting to DPI. During that inquiry, BASD represented that it had not reported any complaints raised by Ms. Garbade during the years 2016 through 2019 because the district did not read her complaints to contain any specific allegations about race discrimination. BASD directly contradicted itself in the Investigation Report on this matter, stating Ms. Garbade's complaints were not reported because she "never submitted a formal discrimination complaint pursuant to the District's Nondiscrimination Policy". BASD must develop a consistent position on when discrimination complaints are reported to DPI. Ms. Garbade alleges that BASD's failure to include the complaints she raised to the district prior to 2020 in its required reporting to DPI is evidence BASD perpetuated the racially hostile environment present in the district. As detailed in V.C.i, DPI agrees that BASD did not reasonably respond to the complaints raised by Ms. Garbade. As noted previously, however, a district's duty to <u>investigate</u> complaints of racial harassment arises whether complaints are "informal" or formal".

## VII.	THE DISPROPORTIONATE SUSPENSION OF BLACK STUDENTS DOES NOT ESTABLISH RACE-BASED DISCRIMINATION.

Ms. Garbade alleges that suspension rates in BASD are also evidence of racial discrimination. Specific instances of disparate treatment of Student A were addressed in Section IV. There is no additional evidence in the record which shows that BASD globally treats <u>similarly-situated</u> white and Black students differently in terms of suspension. DPI has historically determined that the mere existence of disproportionate rates of suspension is insufficient to establish differential treatment discrimination.

## VIII.	BASD'S NONDISCRIMINATION POLICY AND PROCEDURE DO NOT COMPLY WITH WISCONSIN ADMINISTRATIVE CODE.

Beyond the authority afforded by Wis. Stat. § 118.13 to review an appeal from a district's negative determination on a discrimination complaint, DPI has general oversight authority over districts' compliance with Wis. Stat. § 118.13 and Wis. Admin. Code ch. PI 9. *See* Wis. Admin.

Code § PI 9.08(2)(a),(c). In its review of this matter, DPI has identified that BASD's nondiscrimination procedure does not comply with Wis. Admin. Code § PI 9.04(2), which requires that such procedure include a provision for "determination of the complaint within 90 days of receipt of the written complaint." BASD's nondiscrimination grievance procedure provides timelines for response by the Assistant Superintendent and, if that response is appealed, by the Superintendent. However, the procedure does not contain any timeline for ultimate determination of the complaint.

## ORDER

NOW THEREFORE, Ms. Garbade's appeal is denied in part and granted in part.

Within 30 days, Burlington Area School District shall submit to the Department of Public Instruction a corrective action plan specifying steps it will take to: 1) prevent further instances of discrimination in discipline; 2) adequately redress the racially hostile environment present in BASD; 3) review its past reporting on discrimination complaints to ensure compliance with BASD policies and procedures and enact clear guidelines for future reporting; and 4) revise its policies and procedures to ensure they are in compliance with the Wisconsin Administrative Code.

BASD has offered evidence of actions it has undertaken <u>since its resolution</u> of Ms. Garbade's Complaint, including: working with the National Equity Project; an open letter from the Superintendent and the Board rejecting racism, discrimination and harassment; and training on working with SROs. These actions are important first steps to addressing the racially hostile environment at BASD, but BASD is under a continuing obligation to ensure these measures are reasonably calculated to prevent the recurrence of racial harassment throughout the district.

Dated this ___9th___ day of April, 2021.

_Barbara Van Haren_

Barbara Van Haren, PhD
Assistant State Superintendent

32

**APPEAL RIGHTS**

This Decision and Order is the final agency decision regarding this appeal.

Any person aggrieved by this Decision and Order may, within 20 calendar days after service of this decision, request a rehearing by filing a written petition for rehearing which specifies in detail the grounds for the relief sought and supporting authorities, as provided by Wis. Stat. § 227.49. In a petition for rehearing, the State Superintendent of Public Instruction shall be named as respondent.

Any person aggrieved by the Decision and Order may petition for judicial review by filing a petition within 30 days after service of this Decision with the clerk of the circuit court for the county where the judicial review proceedings are to be held, as provided by Wis. Stat. § 227.53. In a petition for judicial review, the State Superintendent of Public Instruction shall be named as respondent.

This notice is provided pursuant to Wis. Stat. § 227.48(2).

# BURLINGTON AREA SCHOOL DISTRICT

## DISCRIMINATION COMPLAINT FORM

<u>NAME:</u> **TAYLOR M. WISHAU**

<u>ADDRESS:</u> **100 N. KANE ST. BURLINGTON, WI 53105**

<u>PHONE:</u> **262.763.0210**        <u>EMAIL:</u> **twishau@basd.k12.wi.us**

<u>STATUS OF PERSON FILING COMPLAINT</u>

_____ STUDENT _____ EMPLOYEE

_____ PARENT __**X**__ OTHER

<u>FILING COMPLAINT ALLEGING DISCRIMINATION ON THE BASIS OF:</u> **RACISM/DISCRIMINATION AGAINST A PROTECTED CLASS. RACISM/DISCRIMATION AGAINST PROTECTED CLASS WITHIN BURLINGTON AREA SCHOOL DISTRICT. RACISM/DISCRIMINATION AGAINST PROTECTED CLASS WITHIN BURLINGTON COMMUNITY.**

**DISCRIMINATION COMPLAINT AGAINST: DARNISHA GARBADE**

**VIOLATION OF BASD POLICY 5517 – ANTI HARASSMENT/ANTI-RACISM**

**VIOLATION OF THE CIVIL RIGHTS ACT OF 1964**

<u>STATEMENT OF COMPLAINT (<i>INCLUDE TYPE OF DISCRIMINATION CHARGED AND THE SPECIFIC INCIDENT(S) IN WHICH IT OCCURRED</i>):</u>

**I AM FILING A FORMAL DISCRIMINATION COMPLAINT AGAINST DARNISHA GARBADE (PRESIDENT OF THE BURLINGTON COALITION TO DISMANTLE RACISM) FOR HER RACIST COMMENTS POSTED ON SOCIAL MEDIA AGAINST A PROTECTED CLASS WHICH IS A CLEAR VIOLATION OF BASD POLICY 5517 – ANTI HARASSMENT/ANTI-RACISM AND VIOLATION OF THE CIVIL RIGHTS ACT OF 1964.**
**THESE STATEMENTS MADE VIA SOCIAL MEDIA ARE COUNTER PRODUCTIVE TO THE BURLINGTON AREA SCHOOL DISTRICTS MISSION/VISION TO REJECT ALL FORMS OF RACISM, DISCRIMINATION, AND HARASSMENT OF STUDENTS, FAMILIES, STAFF MEMBERS, AND/OR VISITORS IN OUR SCHOOLS. SUCH BEHAVIORS WILL BE TREATED AS BEING DESTRUCTIVE TO THE DISTRICT'S MISSION, VISION, VALUES, AND GOALS. THE DISTRICT PLEDGES AND IS COMMITTED TO PROVIDING A PHYSICALLY AND PSYCHOLOGICALLY SAFE, SECURE, AND RESPECTFUL ENVIRONMENT, FREE FROM DISCRIMINATION AND HARASSMENT ON THE BASIS OF RACE, COLOR, RELIGION, AND NATIONAL ORIGIN.**

**THESE STATEMENTS AND ACTIONS ARE FURTHER EVIDENCE TO DENY AND OR REMOVE DARNISHA FROM THE DISTRICT'S "EQUITY" TASK FORCE.**

**(SEE SCREENSHOTS ATTACHED & VIDEO CLIPS VIA EMAIL)**

SIGNATURE OF COMPLAINANT _____

DATE COMPLAINT FILED_____6-25-2021_____

SIGNATURE OF PERSON RECEIVING COMPLAINT_____

DATE COMPLAINT RECEIVED _____          **Exhibit B**

**SUBMIT ALL COPIES TO: COMPLAINT OFFICER, CONNIE ZINNEN, ASSISTANT SUPERINTENDENT, BURLINGTON AREA SCHOOL DISTRICT, 100 NORTH KANE STREET, BURLINGTON, WI 53105**